LOLLEY, J.
| jThis appeal arises out of an insurance coverage dispute whereby four different defendants, Admiral Insurance Company (hereinafter referred to as “Admiral”), Steadfast Insurance Company (hereinafter referred to as “Steadfast”), ACE American Insurance (hereinafter referred to as “ACE”), and Oracle Oil, L.L.C. (hereinafter referred to as “Oracle”), appeal a single judgment granting Oracle’s motion for partial summary judgment against Admiral and ACE, denying Oracle’s motion for partial summary judgment against Steadfast, and granting Steadfast’s motion for summary judgment against Oracle. All of the motions addressed the same issue-the duty to defend. For the reasons set forth below, we reverse the judgment of the trial court and grant summary judgment in favor of Admiral, Steadfast, and ACE.
Facts
This case involves a “legacy lawsuit” by a group of land owners against a group of oil and gas operators who have worked in and around the Bellevue Field in Bossier Parish since the 1930s. Plaintiffs,[1] Lod-wick, L.L.C., Lodwick Minerals, L.L.C., William K. Sample, Hines S. Vaughn, Sr., Thomas G. Jackson, and Arthur Sample, III (hereinafter referred to as “Plaintiffs”), filed suit on March 30, 2006, against various defendants, including Oracle, seeking damages related to defendants’ oil and gas production and exploration activities.[2] These activities include the ^construction and operation of pits, wells, sumps, pipelines, flow lines, tank batteries, well heads, measuring facilities, separators, and injection facilities. Plaintiffs allege that the operation of these facilities, including the spillage and/or disposal of toxic oil field wastes, caused pollution damages on or adjacent to their property.
In particular, plaintiffs allege that from 1978 to 1990, Oracle’s predecessors conducted oil and gas activities, including the operation of numerous oil wells, an open pit, and tank batteries on the property immediately east of and adjacent to Section 15. Oracle allegedly acquired these same wells in 2000 and continues to operate them to present. It was these facilities along with the wells that plaintiffs allege are sources of pollution which have migrated and caused damage to the soils and groundwaters underlying plaintiffs’ property.
Four different insurers provided insurance to Oracle between 2000 and 2011, as more fully described below:
[[Image here]]
*548 [[Image here]]
Upon receiving notice of the lawsuit, Oracle wrote its insurers seeking defense and indemnification. In time, Admiral, Steadfast, and ACE each responded, denying coverage based on certain exclusions, conditions, or endorsements in their policies. However, Bituminous Casualty Corporation (hereinafter referred to as “Bituminous”) initially agreed to defend Oracle. As a result of the denial of coverage, Oracle filed third party demands for indemnification and defense against Admiral, Steadfast and ACE. Oracle sought reimbursement, defense, and indemnity from the three insurance companies, along with all losses, costs, and expenses, including attorney fees incurred or to be incurred by Oracle in defending against the claims asserted by the plaintiffs in the original suit.
Admiral responded by filing a motion for summary judgment and declaratory judgment seeking a dismissal of Oracle’s claim for coverage and a declaration that Admiral did not have a duty to defend Oracle. The trial court denied Admiral’s motion for summary judgement on the duty to defend, and Admiral sought writs with this court. This court denied the writ on April 27, 2012, on the showing made, and stated the applicant would have an adequate remedy on appeal. Likewise, the Louisiana Supreme Court denied writs on September 14, 2012.
Simultaneously in the trial court, Oracle filed a motion for partial |4summary judgment on the duty to defend against Admiral, Steadfast, and ACE. Steadfast responded by filing a cross-motion for summary judgment asserting various conditions and exclusions contained in their policies issued to Oracle. ACE also filed a motion based on its policy language.
In July 2012, Bituminous filed a petition for intervention and intervened in the third party demand, alleging that it was providing Oracle with a defense, and it was entitled to contribution from Admiral, Steadfast, and ACE.
A hearing was held on September 12, 2012, and the trial court granted Oracle’s motion as to Admiral and ACE, finding a duty to defend existed. However, the trial court denied Oracle’s motion for partial summary judgnent as to Steadfast and granted Steadfast’s cross-motion for summary judgment based solely on the “Other Insurance” provision in the Steadfast policy. Explaining its reasoning, the trial court stated:
With respect to the issue of duty to defend, Oracle’s Motion for partial summary judgment filed May 9, 2012 is granted in part, specifically as to Admiral and ACE. It’s denied as to Steadfast on the sole argument, and I’m going to limit it and make certain the record is clear, it’s on the sole — if Steadfast has a *549 provision, and the Court is finding that it has a provision of the policy, that if another policy or insurance has coverage it specifically will not provide a duty to defend. Now, if I’m wrong about that or I missed it or the arguments I missed, then certainly I will be reversed on that, but that’s the basis. If it were not for that provision of the policy, the Court’s ruling would be different. Therefore, as to the Steadfast cross-motion for summary judgment on the issue of, you know, duty to defend that was filed June 18, 2009, it’s granted.
The judgment of the trial court was not certified as suitable for immediate appeal, and this court received writ applications from Oracle, Admiral, Steadfast, and ACE. Ultimately, the trial court certified its | ¿judgments for immediate appeal, and this appeal by the various parties ensued.
STANDARD Of REVIEW
Appellate courts review summary judgments de novo under the same criteria that govern the district court’s consideration of whether summary judgment is appropriate. Elliott v. Continental Cas. Co., 2006-1505 (La.02/22/07), 949 So.2d 1247, 1254; Reynolds v. Select Properties, Ltd., 93-1480 (La.04/11/94), 634 So.2d 1180, 1183; Gonzales v. Geisler, 46,501 (La.App.2d Cir.09/21/11), 72 So.3d 992, 995. A motion for summary judgment will be granted if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact, and that the mover is entitled to judgment as a matter of law. La. C.C.P. art. 966(B).
Relevant to the ease sub judice, in an action under an insurance contract, the insured bears the burden of proving the existence of a policy and coverage. The insurer, however, bears the burden of showing policy limits or exclusions. Tunstall v. Stierwald, 2001-1765 (La.02/26/02), 809 So.2d 916, 921; Whitham v. Louisiana Farm Bureau Cas. Ins. Co., 45,199 (La.App.2d Cir.04/14/10), 34 So.3d 1104, 1107; Gonzales, supra. Summary judgment declaring a lack of coverage under an insurance policy may not be rendered unless there is no reasonable interpretation of the policy, when applied to the undisputed material facts shown by the evidence supporting the motion, under which coverage could be afforded. Elliott, supra; Reynolds, supra; Gonzales, supra.
| ^Interpretation Of Insurance Contracts
An insurance policy is a contract between the parties, and should be construed using the general rules of interpretation of contracts. Blackburn v. National Union Fire Ins. Co. of Pittsburgh, 2000-2668 (La.04/03/01), 784 So.2d 637, 641; Mossy Motors, Inc. v. Cameras America, 2004-0726 (La.App.4th Cir.03/02/05), 898 So.2d 602, 605, writ denied, 2005-1181 (La.12/09/05), 916 So.2d 1057; Gonzales, supra. The parties’ intent, as reflected by the words of the policy, determines the extent of the coverage. Id. If the policy wording at issue is clear and expresses the intent of the parties, the agreement must be enforced as written. Bossier Plaza Assocs. v. National Union Fire Ins. Co. of Pittsburgh, 35,741 (La.App.2d Cir.04/03/02), 813 So.2d 1114, 1119. An insurance policy should not be interpreted in an unreasonable or strained manner so as to enlarge or to restrict its provision beyond what is reasonably contemplated by its terms or so as to achieve an absurd conclusion. Magnon v. Collins, 1998-2822 (La.07/07/99), 739 So.2d 191, 197; Mossy Motors, supra. Likewise, a court should not strain to find ambiguity in a policy where none exists. Fleming Novelty, Inc. v. Alexander, 34,346 (La.App.2d Cir.12/20/00), 775 So.2d 643, writ denied, *550 2001-0239 (La.03/23/01), 787 So.2d 1002; Mossy Motors, supra.
The purpose of liability insurance is to afford the insured protection from damage claims. Policies, therefore should be construed to effect, and not to deny coverage. Thus, if a provision which seeks to narrow the language of the exclusion is subject to two or more reasonable 17interpretations, that which favors coverage must be applied. However, it is equally well settled that insurance companies have the right to limit coverage in any manner they desire, so long as the limitations do not conflict with statutory provisions or public policy. Elliott, supra.
Discussion
Here, there is one issue on appeal — whether Admiral, Steadfast, and ACE owe Oracle a duty to defend. An insurer’s duty to defend suits against its insured is broader than its liability for damage claims. The duty to defend is determined by the allegations of the injured plaintiffs petition, with the insurer being obligated to furnish a defense unless the petition unambiguously excludes coverage. Elliott, supra; Steptore v. Masco Const. Co., 93-2064 (La.08/18/94), 643 So.2d 1213; American Home Assurance Co. v. Czarniecki, 255 La. 251 (La.1969), 230 So.2d 253; Sibley v. Deer Valley Homebuilders, Inc., 45,063 (La.App.2d Cir.03/03/10), 32 So.3d 1034, 1039. This is known as the “eight corners rule,” whereby an insurer must look to the “four corners” of the plaintiffs petition and the “four corners” of its policy to determine whether it has a duty to defend. Vaughn v. Franklin, 2000-291, pg. 5 (La.App.1st Cir.03/28/01), 785 So.2d 79, 84, writ denied, 2001-1551 (La.10/05/01), 798 So.2d 969. American Home Assurance Co., supra. In this analysis, the allegations of the petition are liberally interpreted in determining whether they set forth grounds that bring the claims within the scope of the insurer’s duty to defend. Id. An insurer’s duty to defend arises whenever the pleadings against the insured disclose even a possibility of liability under the policy. Sibley, supra; Vaughn, supra. If assuming all the allegations of the petition to be true, there would be both coverage under the policy and liability of the insured to the plaintiff, the insurer must defend the insured regardless of the outcome of the suit. Elliott, supra.
The application of the eight corners rule calls for this court to compare the “four corners” of plaintiffs’ petition against the “four corners” of each CGL and/or pollution insurance policy and determine whether the claims, liberally interpreted and taken as true, fall within the scope of the duty to defend. If there is no reasonable interpretation of the policy, when applied to the undisputed facts shown by the evidence supporting the motion, under which coverage should be afforded, summary judgment will be proper, and there will be no duty to defend.

Plaintiffs’ Petition

Similar to most legacy lawsuits, plaintiffs raise a plethora of allegations and theories of recovery against numerous oil and gas operators for pollution damage to their property. The trial court had difficulty discerning whether the allegations contained within plaintiffs’ petition were in every respect based on pollution, i.e., the trial court was unable to find that plaintiffs’ cause of action was strictly limited to pollution damages. The crux of Oracle’s argument is that plaintiffs’ petition raises separate causes of action that may be totally unrelated to pollution, such as breach of contract and trespass. It is Oracle’s position that if plaintiffs’ allegations go beyond pollution damages, then the possibility of coverage, and thus the duty to *551 defend remains. After a thorough review and examination of | Splaintiffs’ petition for damages, we disagree.
Oracle is first distinguished in plaintiffs’ second supplemental and amending petition in Paragraph 7, which provides:
[Plaintiffs’] properties ... are believed to be contaminated by the oil and gas exploration and production activities of defendants. Defendants either caused this contamination by virtue of their operations on or adjacent to the property, or are otherwise legally responsible for this contamination by virtue of leases taken or assigned to them, or by virtue of other contractual agreement.”
However, in Paragraph 7.1, it is alleged that Oracle conducted operations on property immediately adjacent to the east of plaintiffs’ property — not on plaintiffs’ property. Additionally, in Paragraph 7.2, it is alleged that Oracle never took leases or assignments affecting plaintiffs’ property. Thus, Oracle is not alleged to be operating on plaintiffs’ property, and Oracle is not alleged to be contractually associated with plaintiffs via lease or assignment. Oracle is next set apart from the other named defendants in Paragraph 7.7, which reads, verbatim:
With regard to the operations of Oracle and Oxy in Section 15, Oxy and its predecessor (Cities Service) have in the past conducted oil and gas operations on the property immediately east of and adjacent to the property owned by plaintiffs in Section 15. As shown in Exhibit H, Oxy operated numerous wells from 1978 to 1990 that fall either on plaintiffs’ property or near the border of plaintiffs’ property. Oracle acquired these same wells in 2000 and continues to operate them to the present. On information and belief, Oracle also operates an open pit and a tank battery in Section 15 not far from plaintiffs’ property, and these facilities along with the Oxy/Oracle wells identified in Exhibit H are sources of pollution that have migrated and caused damage to the soils and groundwaters underlying plaintiffs’ properties. On information and belief, the open pit and tank battery presently operated by Oracle were also operated by Oxy from 1978 to 1990. Furthermore, Oxy or its predecessor (Cities Service) has operated wells in Section 27, as shown in Exhibit H, which have likewise caused damage l10to the soils and groundwaters underlying plaintiffs’ properties.
Plaintiffs allege that the wastes deposited in these pits include naturally occurring radioactive material (“NORM”), produced water, drilling fluids, chlorides, hydrocarbons, and heavy metals. Plaintiffs also allege that the defendants’ failure to responsibly and timely remove this toxic pollution in the soil and groundwater of plaintiffs’ property has allowed the pollution to migrate and spread. It is based on this conduct that plaintiffs are claiming negligence under La. C.C. art. 2315, violation of La. R.S. 30:29 (“Act 312”), violation of industry practice and custom, continuous tort, breach of contract, nuisance, failure to act as a prudent operator and prudent administrator, failure to restore plaintiffs’ property to original condition, unjust enrichment damages, violation of regulatory obligations, and civil trespass.
Further in support, plaintiffs make no demands for damages concerning defendants’ operations other than those related to the seepage or migration of pollutants. For example, plaintiffs do not request damages for the recovery for simple surface-related disturbances such as the unauthorized removal of trees or damage to topsoil. Nor do plaintiffs seek an injunction for the removal of Oracle’s stray wells that were operated beyond its mineral lease on plaintiffs’ property. In fact, *552 plaintiffs specifically describe the alleged trespass at issue as the “continued presence of oilfield wastes on plaintiffs’ lands,” and the civil fruits that are alleged to be due are described as the unauthorized “storage of toxic pollution and wastes in the groundwaters and soils.” Therefore, we conclude that all of Inthe different theories of recovery and allegations are a direct result of defendants’ alleged contamination and pollution damages.
Having concluded that the plaintiffs’ petition is solely based on pollution, we next turn to each insurer’s policy to determine whether coverage is unambiguously excluded. Admiral, Steadfast, and ACE all argue that each of their respective policies issued to Oracle contain applicable provisions which in some way exclude coverage for long-term, environmental pollution damages. We agree. Specifically, we find that all of the allegations set forth above, fit squarely within the clear language of each insurers’ pollution exclusion contained within each policy issued to Oracle.

The Admiral Policies

Admiral provided CGL insurance and an excess policy to Oracle from March 2000 to March 2003, subject to certain terms, conditions, limitations, exclusions, and endorsements. All three of the policies’ insuring agreements provide:
1. Insuring Agreement
a. We will pay those sums that the insured becomes legally obligated to pay as damages because of “bodily injury” or “property damage” to which the insurance applies. We will have the right and duty to defend the insured against any “suit” seeking those damages. However, we will have no duty to defend the insured against any “suit” seeking damages for “bodily injury” or “property damage” to which the insurance does not ap-pty[.]
b. This insurance applies to “bodily injury” and “property damage” only if:
(1) The “bodily injury” or “property damage” is | ^caused by an “occurrence” that takes place in the “coverage territory”;
(2) The “bodily injury” or “property damage” occurs during the policy period[.]
Admiral’s policies were also subject to a pollution exclusion, which provides:
2. Exclusions
This insurance does not apply to:
[[Image here]]
f. Pollution
(1) “Bodily injury” or “property damage” arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants”:
(a) At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to any insured!.]
(b) At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;
(c) Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste by or for any insured or any person or organization for whom you may be legally responsible!.]
[[Image here]]
(2) Any loss, cost or expense arising out of any:
*553 (a) Request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in | isany way respond to, or assess the effects of, “pollutants”; or
(b) Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of “pollutants”.
[[Image here]]
15. “Pollutants” means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.
Additionally, Admiral’s policy issued to Oracle for the period of March 12, 2000, to March 12, 2001, contains a Total Pollution Exclusion Endorsement. This endorsement modifies the pollution exclusion found in Paragraph f, and provides:
TOTAL POLLUTION EXCLUSION ENDORSEMENT
This endorsement modifies insurance provided under the following:
COMMERCIAL GENERAL LIABILITY COVERAGE PART
Exclusion f. under Paragraph 2. Exclusions of Coverage A — Bodily Injury And Property Damage Liability (Section I— Coverages) is replaced by the following:
This insurance does not apply to:
f. Pollution
(1) “Bodily injury” or “property damage” which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of “pollutants” at any time.
(2) Any loss, cost or expense arising out of any:
|u(a) Request, demand, order or statutory or regulatory requirement that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of “pollutants” or
(b) Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of, “pollutants.”
“Pollutants” are defined by the policies to mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.
The excess policy also contains a pollution exclusion with similar language.[3]
*554 As noted, an insurer’s duty to defend is determined by examining the “four corners” of the plaintiffs’ petition and the “four corners” of the insurance policy, with the insurer being obligated to furnish a defense unless coverage is unambiguously excluded. American Home Assurance Co., supra; Sibley, supra.
Under the language of the Admiral policy, coverage is excluded for damages:
| ^arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants as well as any loss, cost or expense arising out of any request, demand or order that any insured or others test for, monitor, clear up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, pollutants.
Likewise, the Total Pollution Endorsement excludes coverage for “bodily injury or property damage which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants at any time.” The excess policy’s pollution exclusion also excludes coverage for any “bodily injury, property damage, or personal injury arising out of any environment by pollutants that are introduced at any time, anywhere, in any way, and to costs or other loss or damage arising out of such contamination.” The term “pollutants” is defined as “any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste.”
For purposes of determining coverage, we accept as true plaintiffs’ allegations that Oracle and their predecessors participated in the operation and construction of an open pit and tank battery in Section 15 not far from plaintiffs’ property, and it was these facilities that are the sources of pollution which have migrated and caused damage to the soils and groundwaters underlying plaintiffs’ properties. It is alleged that Oracle used or is using these sites for the handling, storage, disposal, processing or treatment of waste, and further, it is alleged that the property was contaminated with NORM, produced water, drilling fluids, chlorides, hydrocarbons, and heavy metals, amongst other contaminants. As discussed above, no other damages are alleged besides those resulting from thejjgseepage or migration of pollutants.
If the policy wording at issue is clear and expresses the intent of the parties, the agreement must be enforced as written. Additionally, we must not strain to find ambiguity in a policy where none exists. When compared against plaintiffs’ petition for damages, we find that coverage is unambiguously excluded under the clear terms of the Admiral policy. There is no question that this legacy lawsuit would not have arisen but for the “actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants.” There is also no question that NORM, produced water, drilling fluids, chlorides, hydrocarbons, and heavy metals fall within the definition of pollutants as defined in the policy. These materials are at the very least contaminants, chemicals, or wastes. Therefore, we find that coverage is unambiguously excluded based on the clear terms of the pollution exclusion, and accordingly, Admiral owes no duty to defend Oracle in the instant matter.

The Steadfast Policies

Steadfast issued three CGL policies to Oracle from March 12, 2003, to March 12, 2006, which were in all material aspects identical. Relevant provisions of the Steadfast policies provide:
1. Insuring Agreement
a. We will pay those sums that the insured becomes legally obligated *555 to pay as damages because of “bodily injury” or “property damage” |17to which this insurance applies. We will have the right and duty to defend the insured against any “suit” seeking those damages. However, we will have no duty to defend the insured against any “suit” seeking damage for “bodily injury” or “property damage” to which this insurance does not ap-piy[J
b. This insurance applies to “bodily injury” or “property damage” only if:
(1) the “bodily injury” or “property damage” is caused by an “occurrence” that takes place in the “coverage territory”;
(2) the “bodily injury” or “property damage” occurs during the policy period.
[[Image here]]
2. Exclusions
This insurance does not apply to:
* ⅜ *
f. Pollution
(1) “Bodily injury” or “property damage” arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of “pollutants”:
(a) At or from any premises, site or location which is or was at any time owned or occupied by, or rented or loaned to, any insured[.]
[[Image here]]
(b) At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;
(c)Which are or were at any time transported, handled, stored, ■ treated, disposed of, or processed as waste by or for any insured or any person or organization for whom you may be legally responsible[.]
[[Image here]]
[ ^However, the policies contain a Time Element Limited Pollution Liability Endorsement for Energy and/or Energy Related Operations, which changes the policies, and modifies the above Pollution Exclusion under Section I — Coverages. This endorsement, in pertinent part, provides:
TIME ELEMENT LIMITED POLLUTION LIABILITY ENDORSEMENT FOR ENERGY AND/OR ENERGY RELATED OPERATIONS
THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY
This endorsement modifies insurance provided under the following:
COMMERCIAL GENERAL LIABILITY COVERAGE PART
Exclusion f. under paragraph 2., Exclusions of Section 1 — Coverage A — Bodily Injury and Property Damage Liability is replaced with the following:
f. Pollution
1. Any injury or damage which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants at any time.
2. Any loss, cost or expense arising out of any:
*556 a. Request, demand or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of pollutants; or
b. Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, cleaning up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or 113assessing the effects of pollutants.
Pollutants mean any solid, liquid, gaseous, or thermal irritant or contaminant including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.
Notwithstanding the above, but subject to all other exclusions and to all other terms and conditions of the policy as amended by this endorsement, we will pay on behalf of the insured those sums that the insured shall become legally obligated to pay as damages because of a “pollution incident” that results in “bodily injury” or “property damage”, PROVIDED ALWAYS THAT:
(1) The “pollution incident” must:
(a) be neither expected nor intended from the standpoint of an insured;
(b) have first commenced during the “policy period”;
(c) be discovered by the “insured” within seven (7) days of commencement; and
(d) be reported to the Company, in writing, within thirty (80) days from the date of the commencement.
We have the right and duty to defend “suits” for damages in excess of the deductible or the self-insured retention stated in the Declarations arising out of “pollution incidents” only if the above conditions are met. If we have a factual disagreement about these conditions, the burden of proof rests with you at your expense. We will have no obligation to defend any “suit” until we have accepted your proof; and;
(2) Provided that the conditions (1.) Above are met, any “claim” arising out of “bodily injury” or “property 12ndamage” on account of a “pollution incident” must be made upon the insured and reported to us in writing as soon as practicable, and in no event later than three (3) years after the policy has ended. WE WILL ONLY PAY FOR DAMAGES ARISING OUT OF “CLAIMS” FOR “BODILY INJURY” OR “PROPERTY DAMAGE” THAT ARE MADE AND REPORTED WITHIN THIS PERIOD.
Notably, the Time Element Limited Pollution Liability Endorsement in the Steadfast policies excludes coverage for any “injury or damage which would not have occurred in whole or part but for the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants at any time.” It also excludes coverage for any “loss, cost or expense arising out of any request, demand, or order that any insured or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the affects of pollutants.” “Pollutants” is defined in the *557 policy as “any solid, liquid, gaseous, or thermal irritant or contaminant including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste.” A “pollution incident” is defined as a “discharge, dispersal, release or escape of pollutants into or upon land, the atmosphere, or any water course or body of water, that arises from insured operations.”
However, if certain conditions are met, the language of the endorsement makes it clear that coverage will be provided for certain limited pollution incidents. These conditions include: (1) the pollution incident must be neither expected nor intended from the standpoint of an | ¡^insured; (2) the pollution incident must have first commenced during the policy period; (3) the pollution incident must be discovered by the insured within 7 days of commencement; and, (4) the pollution incident must be reported to Steadfast, in writing, within 30 days from the date of commencement. The endorsement also contains a catch-all condition, which states that any “claim” arising out of “bodily injury” or “property damage” on account of a “pollution incident” must be made upon the insured and reported to us in writing as soon as practicable, and in no event no later than 3 years after the policy has ended.
Parallel to the analysis above, Oracle is alleged to have participated in the operation of an open pit and tank battery on land immediately east of and adjacent to plaintiffs’ properties on Section 15. These activities are alleged to have resulted in the spillage, seepage, and migration of contaminants such as NORM, produced water, drilling fluids, chlorides, hydrocarbons, and heavy metals into the groundwa-ters and soil underlying plaintiffs’ land. When taken as true, these allegations clearly fall within the explicit exclusions of the Steadfast policy. Nevertheless, the record is also clear that Oracle did not comply with any of the conditions precedent to coverage. Plaintiffs allege the incident was not discovered by Oracle within 7 days, the pollution was not reported to Steadfast, in writing, within 30 days, and, the pollution was not reported within 3 years of the termination of the Steadfast policy. The policy expressly provides that if the listed conditions are not met, then Steadfast will have no duty to defend the insured. Therefore, we find that the Time Element Limited Pollution 122Liability Endorsement unambiguously excludes coverage for the allegations raised against Oracle in plaintiffs’ petition for damages, and consequently, Steadfast is relieved of the duty to defend.
Steadfast’s cross-motion for summary judgment was granted based solely on the “Other Insurance” provision, as amended by the Total Pollution Exclusion contained within their policy. The trial court agreed with Steadfast’s argument that the insurance became “excess” once Bituminous began undertaking a defense for Oracle. Steadfast also asserted several other defenses and exclusions on appeal, including the known loss and loss in progress endorsement as well as other policy exclusions. However, because we find that the pollution exclusion within the Steadfast policy excludes coverage and results in Steadfast being dismissed from the suit on other grounds, these arguments are now moot and will not be discussed.

The ACE Policy

ACE issued a CGL insurance policy to Delphi Oil, Inc., covering from the period March 12, 2010, to March 12, 2011, in which Oracle was named as an additional insured. Pertinent provisions of the ACE policy provide:
1. Insuring Agreement
a. We will pay those sums that the insured becomes legally obligated to pay as damages because of “bodily *558 injury” or “property damage” to which this insurance applies. We will have the right and duty to defend the insured against any “suit” seeking those damages. However, we will have no duty to defend the insured against any “suit” seeking damages for “bodily injury” or “property damage” to which this insurance does not apply[.]
| ¾⅜. This insurance applies to “bodily injury” and “property damage” only if:
1. The “bodily injury” or “property damage” is caused by an “occurrence” that takes place in the “coverage territory”;
2. The “bodily injury” or “property damage” occurs during the policy period; and
3. Prior to the policy period, no insured ... knew that the “bodily injury” or “property damage” had occurred, in whole or in part. If such a listed insured ... knew, prior to the policy period, that the “bodily injury” or “property damage” occurred, then any continuation, change or resumption of such “bodily injury” or “property damage” during or after the policy period will be deemed to have been known prior to the policy period.
[[Image here]]
2. Exclusions
This insurance does not apply to:
[[Image here]]
f. Pollution
(1) “Bodily injury” or “property damage” arising out of the actual, alleged, or threatened discharge, dispersal, seepage, migration, release or escape of “pollutants”:
(a) At or from any premises, site or location which is or was at any time owned or occupied by; or rented or loaned to, any insured[.]
[[Image here]]
(b) At or from any premises, site or location which is or was at any time used by or for any insured or others for the handling, storage, disposal, processing or treatment of waste;
124(c) Which are or were at any time transported, handled, stored, treated, disposed of, or processed as waste[.]
[[Image here]]
15. “Pollutants” mean any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste.
However, ACE’s policy also contains an Endorsement, which replaces the above pollution exclusion, and provides:
II. Deletion and Replacement of Pollution Exclusion
The Pollution Exclusion in the Policy is deleted. It is replaced with the following exclusion and with the exceptions and limitations in Section III (Pollution Liability Coverage) that provided you with the only coverage for pollution liability policy.
Except as provided by this endorsement only, this insurance does not apply to any injury, damage, expense, cost, “loss”, liability or legal obligation arising out of or in any way related to “pollutants”, however caused. Except as provided by this endorsement only, we shall have no duty to defend any “suit”, claim or proceeding arising out of or in any way related to “pollutants”.
III. Pollution Liability Coverage
A. Covered “Pollution Incident”
*559 Subject to Paragraphs III.C. and III.D. below, which excludes absolute pollution liability, this Pollution Exclusion does not apply to “bodily injury”, “property damage”, or “remediation costs” caused by a “pollution incident”, meaning a discharge of “pollutants” into the “environment”, provided that:
1. The discharge is both unexpected or unintended from the standpoint of the “insured”; and
2. The discharge commenced abruptly and instantaneously and can be clearly identified as having commenced entirely at a specific | ¡>stime on a specific date during the policy period; and
3. The discharge commenced at or from a site, location or premises:
a) owned by or occupied by, or rented or loaned to, any “insured” at the time the discharge commenced;
b) at which any “insured”, or any contract(s) or subcontractor(s) working directly or indirectly on any “insured’s behalf, was performing operations at the time the discharge commenced; and
4. The discharge was known by any “insured” within 30 days of the commencement of the discharge of “pollutants”; and
5. The discharge was reported to us within 60 days of the commencement of the discharge of “pollutants”.
B. Mandatory Documentation
As condition precedent to coverage under this endorsement, you must provide conclusive documentation of strict compliance with requirements 1 through 5 in section III.A. above, regardless of whether we are prejudiced by the failure to meet these requirements.
C. Pollution Liability That Is Never Covered
Notwithstanding anything to the contrary in the foregoing paragraphs and regardless of (1) the cause of the discharge of “pollutants”, or (2) whether the discharge otherwise might satisfy the conditions of section III.A. and III.B. above, this insurance does not apply to injury, damage, expense, cost, “loss”, liability or legal obligation arising out of or in any way related to any actual or alleged discharge, dispersal, seepage, migration, release or escape of “pollutants” at, from or related to any:
1. “waste site”,
12f;2. “closed facility”,
3. premises, site, or location any “insured” has sold, given away, or abandoned,
4. “radioactive material”
(Emphasis in original.)
Like Steadfast, ACE’s policy provides coverage for limited pollution incidents but only when certain conditions are met. The conditions precedent to coverage are as follows: (1) the discharge is both unexpected or unintended from the standpoint of the insured; (2) the discharge of pollutants must commence abruptly and instantaneously such that it can be said to have commenced entirely at a specific time and date within the policy period; (3) the discharge must have been known by the insured within 30 days of the commencement of the discharge of pollutants; and, (4) the discharge must have been reported to ACE within 60 days of the commencement of the discharge of pollutants. Importantly, the endorsement further states that if the conditions are not met, ACE has no *560 duty to defend any suit that is in “any way related to pollution.” Specifically, coverage is excluded for any “injury, damage, expense, cost, loss, liability, or legal obligation arising out of or in any way related to pollutants, however caused, at, from or related to any waste site, closed facility, premises, site or location any insured has sold, given away or abandoned, or radioactive material.” It is clear that ACE’s policy provides coverage only for short term, instantaneous pollution incidents, but not for pollution incidents such as alleged by plaintiffs.
The record is also clear that Oracle met none of the conditions precedent for coverage. It is alleged that the discharge did not commence ^abruptly and instantaneously, that the discharge was not known by Oracle within 30 days of the commencement of discharge, and that Oracle did not report the incident to ACE within 60 days. Regardless, the policy expressly excludes coverage, however caused, for any damage arising out of or in any way related to pollutants at, from, or related to any waste site. As discussed extensively above, plaintiffs’ allegations are, at a minimum, related to pollution and pollutants. And, it is alleged that these pollutants seeped and migrated from Oracle’s closed pit and tank battery into the soil and groundwaters underlying plaintiffs’ lands. These allegations inarguably fall within the exclusions in the ACE policy. As a result, we find coverage to be unambiguously excluded under the ACE policy and further find that ACE does not owe Oracle a duty to defend.
ACE also argues that coverage is unambiguously excluded if the insured had knowledge that the property damage had occurred prior to the policy period. Again, because we find the that the endorsement within the ACE policy unambiguously excludes coverage for pollution based allegations, this argument is now moot and need not be addressed.

Doerr v. Mobil Oil Corp.

As a final matter, we reject Oracle’s contention that according to Doerr v. Mobil Oil Corp., 2000-0947 (La.12/19/00), 774 So.2d 119, the pollution exclusions found within the policies are inapplicable to the facts of this case. In Doerr, the seminal case addressing pollution exclusions, the Louisiana Supreme Court detoured from its previous stance that total pollution exclusions were intended to be read strictly to exclude coverage 12sfor all interactions with irritants or contaminants. Rather, the court narrowed its application of the exclusions and clarified that the purpose of the pollution exclusion was to exclude coverage for environmental pollution. It was also meant to strengthen environmental protection standards by imposing the full risk of loss due to personal injury or property damage from pollution upon the polluter by eliminating the option of spreading that risk through insurance coverage. In its reasoning, the court explained that pollution exclusions were born out of the environmental movement of the 1970s and were shaped in response to legislation designed to prompt the cleanup of hazardous waste sites and impose cleanup costs on responsible parties. Notably, Doerr did not involve the type of claims for which the exclusion was designed; it was a personal injury case, not an environmental pollution case as alleged here. Thus, guided by the principles set forth in Doerr, we find that when long term pollution damages are alleged, such as the case with legacy lawsuits, pollution exclusions are applicable to exclude coverage. As stated in Doerr, this is the very purpose of a pollution exclusion. Id. at 127.
The Doerr court set forth three factors to resolve the applicability of pollution exclusions: (1) whether the insured is a “pol *561 luter” within the meaning of the exclusion; (2) whether the injury-causing substance is a “pollutant” within the meaning of the exclusion; and, (3) whether there was a “discharge, dispersal, seepage, migration, release or escape” of a pollutant by the insured within the meaning of the policy. Id. at 135.
Throughout plaintiffs’ petition for damages, all defendants, including 1 ^Oracle, are alleged to be oil field operators and producers. Jurisprudence has established that oil field operators and producers are “polluters” under the Doerr test due to the fact that oil drilling and related activities present a clear and obvious risk of pollution. Grefer v. Travelers Ins. Co., 04-1428 (La.App.5 Cir.12/16/05), 919 So.2d 758. Next, the court in Grefer also noted that contaminants such as NORM, oil, sludge, grease, salt water, and other hazardous and/or toxic substances are “pollutants” within the meaning of the total pollution exclusion. Id. at 771. Plaintiffs also allege that their property was contaminated by other contaminants including mercury, lead-based compounds, chromium-based al-gicides, hydrochloric acid, caustic soda, and various corrosion inhibitors. Certainly, these substances qualify as chemicals, contaminants, irritants, or waste under the various exclusions. Finally, it is alleged that these substances seeped and migrated from Oracle’s open pit and tank battery into the soil and groundwaters underlying plaintiffs’ lands. This is the foundation of plaintiffs’ lawsuit. Oracle never alleged any damages other than those related to the “discharge, dispersal, seepage, migration, release or escape” of pollutants. Plaintiffs’ allegations make it clear that all three Doerr factors are met — (1) Oracle is a “polluter” within the policy; (2) the injury-causing substances, such as NORM, are “pollutants” within the policy; and, (3) there was a “discharge, dispersal, seepage, migration, release or escape” of pollutants. In any event, we find that this legacy lawsuit is the exact type of case the Doerr court found pollution exclusions to be applicable.
Conclusion
| 3nFor the foregoing reasons, we find that the pollution exclusions within the Admiral, Steadfast, and ACE policies unambiguously exclude coverage, and thus the trial court erred in granting Oracle’s motions for summary judgment on the issue of the insurers’ duty to defend. Accordingly, the judgment of the trial court granting Oracle’s motions for summary judgment is reversed, and summary judgment is hereby granted in favor of Admiral, Steadfast and ACE. All costs of this appeal are assessed to Oracle.
REVERSED.
APPLICATION FOR REHEARING
Before BROWN, STEWART, CARAWAY, DREW and LOLLEY, JJ.
Rehearing denied.

. Plaintiffs are lessors, assigns, third party beneficiaries, and/or successors in interest to certain oil, gas, and mineral leases between plaintiffs and defendants, and allege that they own, reside on and/or use land that was damaged due to the defendants’ activities relating to oil and gas exploration in Sections 9, 10, 15, 16, 21, 22, and 27, Township 19 North, Range 11 West in Bossier Parish, State of Louisiana.

. In September 2009, plaintiffs filed a supplemental and amending petition for damages, and in June 2010, filed a second supplemental and amending petition for damages.

. The pollution exclusion contained within the excess policy provides that this policy does not apply to:
any bodily injury, property damage, or personal injury arising out of any environment by pollutants that are introduced at any time, anywhere, in any way, and to costs or other loss or damage arising out of such contamination including but not limited to, cleaning up, remedying or detoxifying such contamination, or to payment of sums related to: (1) the investigation or defense of any loss, injury or damage; or (2) payment of any costs, fine, penalty; or (3) payment of any expenses involving a claim or suit related or defined herein[.]